UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                            :

ALECHEA TONEY-DICK, X.T., RENEE    :
MOORE, and SHERRY HANAN, individually  :
and on behalf of others similarly situated,   :
                            :

            Plaintiffs,        :    No. 12 Civ. 9162(KBF)
                            :

      -against-         :    **PLAINTIFFS' MEMORANDUM OF**
                            :    **LAW IN SUPPORT OF THEIR**
ROBERT DOAR, in his official capacity as  :    **MOTION FOR A PRELIMINARY**
Commissioner of the New York City Human  :  **INJUNCTION AND CLASS**
Resources Administration, and the NEW   :    **CERTIFICATION**
YORK CITY HUMAN RESOURCES     :
ADMINISTRATION,              :

           Defendants.     :
-------------------------------------------------------x

GIBSON, DUNN & CRUTCHER LLP
RANDY M. MASTRO
JUSTIN SOLOMON NEMATZADEH
200 Park Avenue
New York, NY  10166-0193
Telephone:    212.351.4000
Facsimile:    212.351.4035

Attorneys for Plaintiffs

THE LEGAL AID SOCIETY
STEVEN BANKS

ADRIENE HOLDER
JUDITH GOLDINER
KENNETH STEPHENS
KATHLEEN KELLEHER
SUMANI LANKA
SUSAN STERNBERG
SUSAN WELBER
111 Livingston Street, 7th Floor
Brooklyn, NY 11203
(temporary location)
Telephone: 646/761-9291
Fax: 718/722-3093
(temporary numbers)

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS..........................................................................................3

ARGUMENT..............................................................................................................9

I. PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
SHOULD BE GRANTED. .......................................................................... 9

    A. Class Members Will Suffer Irreparable Harm in the Absence of a
Preliminary Injunction. .................................................................... 9

    B. Plaintiffs Are Likely To Succeed On The Merits. ................................ 12

        1. Defendants Violated the ADA, the RA, and State and Local
Anti-Discrimination Laws. ............................................. 12

            (a) Plaintiffs Are Disabled Within the Meaning of the ADA,
the RA, and State and City Anti-Discrimination Laws.................... 13

            (b) Defendants Are Covered by the ADA, the RA, and State
and City Anti-Discrimination Laws................................ 14

            (c) Defendants Discriminated Against Plaintiffs by
Implementing The D-SNAP Program in Violation of the
ADA, the RA, and State and City Anti-Discrimination
Laws................................................................. 15

                (1) Defendants Designed the D-SNAP Program without
Regard to the Needs of People with Disabilities. .................... 16

                (2) The Defendant's "Authorized Representative"
Procedures Were an Insufficient Accommodation for
People with Disabilities..........................................17

                (3) Plaintiffs Have Identified a Range of Reasonable
Accommodations.................................................20

        2. Defendants Violated the Food Stamp Act. ............................21

    C. The Balance of Hardships Favors Plaintiffs. ...............................23

II. THE PROPOSED PLAINTIFF CLASS SHOULD BE CERTIFIED. .................... 24

    A. The Class is So Numerous that Joinder of All Members Is Impracticable............25

**TABLE OF CONTENTS** *(continued)*

Page

B.   There are Questions of Law and Fact Common to the Plaintiff Class....................26

C.   The Claims of the Named Plaintiffs are Typical of the Claims of the Plaintiff Class..........................................................................................27

D.   The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Plaintiff Class..........................................................................................27

E.   This Action Meets the Requirements of Federal Rule of Civil Procedure 23(b)..................................................................................................28

**CONCLUSION** ..............................................................................................**29**

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alexander v. Choate,*
   469 U.S. 287, 301 (1985) ................................................................ 17

*Anwar v. Fairfield Greenwich Ltd.,*
   728 F.Supp.2d 462 (S.D.N.Y. 2010) ................................................ 9

*Bogoni v. Gomez,*
   847 F. Supp. 2d 519 (S.D.N.Y. 2012) ............................................ 25

*Borkowski v. Valley Cent. Sch. Dist.,*
   63 F.3d 131 (2d Cir. 1995) ............................................................ 22

*Bragdon v. Abbott,*
   524 U.S. 624 (1998) ...................................................................... 15

*Bronx Household of Faith v. Bd. of Educ.,*
   331 F.3d 342 (2d Cir. 2003) .......................................................... 9

*Brooklyn Ctr. for Independence of the Disabled v. Bloomberg,*
   __ F.R.D. ___, No. 11 Civ. 6690 (JMF), 2012 WL 5438849 (S.D.N.Y. Nov.
   7, 2012) ................................................................................. 28, 30

*Brown v. Giuliani,*
   158 F.R.D. 251 (E.D.N.Y. 1994) ............................................. 10, 11

*Consol. Rail Corp. v. Town of Hyde Park,*
   47 F.3d 473 (2d Cir. 1995) ............................................................ 28

*Cortigiano v. Oceanview Manor Home for Adults,*
   227 F.R.D. 194 (E.D.N.Y. 2005) ................................................... 31

*Dopico v. Goldschmidt,*
   687 F.2d 644 (2d Cir. 1982) ....................................................... 2, 17

*Gen. Tel. Co. of the Sw. v. Falcon,*
   457 U.S. 147 (1982) ...................................................................... 30

*Goldberg v. Kelly,*
   397 U.S. 254 (1970) ...................................................................... 11

*Hafer v. Melo,*
   502 U.S. 21 (1991) ........................................................................ 24

*Henrietta D. v. Bloomberg,*
   331 F.3d 261 (2d Cir. 2003) .......................................................... 14

*Henrietta D. v. Giuliani,*
   119 F. Supp. 2d 181 (E.D.N.Y. 2000) ...................... 10, 11, 17, 30, 32

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*J.D. ex rel. J.D. v. Pawlet Sch. Dist.,*
    224 F.3d 60 (2d Cir. 2000) ....................................................................... 17

*Jacques v. DiMarzio, Inc.,*
    386 F.3d 192 (2d Cir. 2004) ..................................................................... 15

*Lovely H. v. Eggleston,*
    235 F.R.D. 248 (S.D.N.Y. 2006) ........................................ 12, 16, 25, 27, 30, 32

*M.K.B. v. Eggleston,*
    445 F. Supp. 2d 400 (S.D.N.Y. 2006) ....................................................... 27

*Marisol A. ex. rel. Forbes v. Giuliani,*
    126 F.3d 372 (2d Cir. 1997) ..................................................................... 31

*Monell v. Dep't of Soc. Servs.,*
    436 U.S. 658 (1978) ........................................................................... 24, 25

*Morel v. Giuliani,*
    927 F. Supp. 622 (S.D.N.Y. 1995) ............................................................ 10

*N.Y. Civic Ass'n of the Deaf of N.Y.C., Inc. v. Giuliani,*
    915 F. Supp. 622 (S.D.N.Y. 1996) ............................................................ 26

*Raymond v. Rowland,*
    220 F.R.D. 173 (D. Conn. 2004) .......................................................... 30, 32

*Rex Med. L.P. v. Angiotech Pharm. (U.S.), Inc.,*
    754 F. Supp. 2d 616 (S.D.N.Y. 2010) ....................................................... 25

*Reynolds v. Giuliani,*
    35 F.Supp.2d 331 (S.D.N.Y. 1999) ............................................ 10, 13, 23, 24

*Robidoux v. Celani,*
    987 F.2d 931 (2d Cir. 1993) ................................................................ 28, 29

*Shakhness ex. rel. Shakhnes v. Eggleston,*
    740 F. Supp. 2d 602 (S.D.N.Y. 2010) ....................................................... 30

*Shapiro v. Cadman Towers, Inc.,*
    51 F.3d 328 (2d Cir. 1995) ........................................................................ 9

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
    60 F.3d 27 (2d Cir. 1995) .......................................................................... 9

*United Spinal Ass'n v. Bd. of Elections,*
    2012 U.S. Dist. LEXIS 112474 (S.D.N.Y. Aug. 8, 2012) ............................. 22

*Wendel v. New York,*
    574 F. Supp. 2d 290 (E.D.N.Y. 2008) ....................................................... 18

*Willis v. Lascaris,*
    499 F. Supp. 749 (N.D.N.Y. 1980) ....................................................... 11, 12

*Williston v. Eggleston,*
    379 Supp. 2d 561 (S.D.N.Y. 2005) ........................................................... 27

**TABLE OF AUTHORITIES** *(continued)*

<u>Page(s)</u>

**Statutes**

18 N.Y.C.R.R. § 303.1 ........................................................................................ 13

29 U.S.C. § 794 .................................................................................................. 12

29 U.S.C. § 794(b)(1) ......................................................................................... 15

42 U.S.C. § 12102(2)(A) ..................................................................................... 14

42 U.S.C. § 12131(1) .......................................................................................... 15

42 U.S.C. § 12132 ......................................................................................... 12, 15

42 U.S.C. § 12134(a) .......................................................................................... 15

7 U.S.C. § 2011 .................................................................................................. 22

7 U.S.C.§ 2020(e)(14) ........................................................................................ 23

N. Y. Exec. Law § 296-2(a) ................................................................................ 13

N.Y. Soc. Serv. Law  § 331(3) ............................................................................ 13

New York City Human Rights Law, Ch. 1, § 8-102(9) ...................................... 15

New York City Human Rights Law, Ch. 1, § 8-107(4)(a) .................................. 13

**Regulations**

28 C.F.R § 35.104 ............................................................................................... 14

28 C.F.R. § 35.104 (2003) .................................................................................. 14

29 C.F.R. § 1630.2(j)(2)(i) .................................................................................. 14

29 C.F.R. § 1630.2(j)(2)(ii) ................................................................................. 14

7 C.F.R. § 273.2(c)(1) ......................................................................................... 20

7 C.F.R. § 273.2(e)(1)-(2) ................................................................................... 20

C.F.R. 35.130(b)(3)(i) (ii) .................................................................................. 17

C.F.R. 35.130(b)(4)(i) (ii) .................................................................................. 17

## PRELIMINARY STATEMENT

Plaintiffs now move for a preliminary injunction and class certification seeking to require the City Defendants to formally request that the New York State Office of Temporary and Disability Assistance ("OTDA") permit them to operate a new Disaster Supplemental Nutrition Assistance Program ("D-SNAP") in a manner consistent with the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq*., the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794 *et seq*., New York state and local laws prohibiting disability discrimination, and the Food Stamp Act ("FSA"), 7 U.S.C. § 2020.  More specifically, the City Defendants should be required to request that the appropriate federal and state officials authorize them to implement another D-SNAP program that provides meaningful access to the Plaintiff class through reasonable accommodations, such as (i) several additional satellite locations for applications, (ii) the option to apply online, through mail, by calling, or by faxing, (iii) the option to request home visits to complete applications, and (iv) other reasonable accommodations that are employed in the Supplemental Nutrition Assistance Program ("SNAP").[1]  Based on past practice and present conduct, the City Defendants have refused to make these reasonable accommodations to help the disabled access vital public benefits in the aftermath of Hurricane Sandy's destruction, and they are intentionally avoiding asking the appropriate federal and state officials for authority to do so. As a result, Plaintiffs are now compelled to seek emergency injunctive relief from the Court.

Plaintiffs, representing a proposed class of disabled Hurricane Sandy survivors, seek this targeted relief because they are now being discriminated against and denied access to D-SNAP benefits, intended to get food to victims of extraordinary hardship yet now denied to the City's

---

[1] Effective October 1, 2008, the federal Food Stamp Program was renamed the Supplemental Nutrition Assistance Program ("SNAP"), and the federal Food Stamp Act was renamed the Food and Nutrition Act of 2008.  *See* Food Conservation & Energy Act of 2008, Pub. L. No. 110-246 §§ 4001-4002 (2008).

1

disabled who were devastated by Hurricane Sandy.  One of the primary goals of the ADA is to provide disabled individuals with meaningful access to public benefits and services through reasonable accommodations.  An underlying rationale for this noble end is to provide those with disabilities opportunities to autonomously access such benefits.  The U.S. Court of Appeals for the Second Circuit has articulated why such reasonable accommodations are necessary:  "[It] is not enough to open the door for the handicapped . . .; a ramp must be built so the door can be reached."  *Dopico v. Goldschmidt*, 687 F.2d 644, 652 (2d Cir. 1982).  But because the City Defendants have failed to offer such reasonable accommodations in the past and are apparently intent on failing to do so again here, hundreds—if not thousands—of individuals with disabilities have been unable to meaningfully access these vital public benefits.  The City Defendants have barely opened "the door for the handicapped," and they have fallen woefully short of building a ramp "so the door can be reached."  The only attempted accommodation made to those with disabilities to access D-SNAPS benefits has been to (i) offer the opportunity to authorize a representative to travel long distances to a few available application sites, (ii) demand that these representatives have personal and invasive knowledge about the disabled person, and (iii) have these representatives attest to the truth of such personal and invasive information subject to perjury.  It comes as no surprise, then, that those so-called "accommodations" have failed to help the disabled who are in emergency-need access these vital benefits in a timely, effective way, and are therefore being irreparably harmed as a result.

Plaintiffs are also likely to succeed on their claims under the ADA, the Rehabilitation Act, New York state and local laws, and the FSA, for the following reasons, among others:

(i)   Defendants designed the D-SNAP program without regard for the needs of people with disabilities;

(ii)  Defendants' "authorized representative" procedures were insufficient accommodations for people with disabilities; and

(iii)   Plaintiffs have identified a range of reasonable accommodations.

Plaintiffs seek preliminary injunctive relief directing the City Defendants to seek approval from the OTDA to rectify its violation of the law by providing class members meaningful access through reasonable accommodations to apply for D-SNAP benefits in the wake of the Hurricane Sandy disaster.  Also, Plaintiffs seek class certification, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), of individuals with disabilities who are eligible to apply for this program but who need reasonable accommodations in order to do so.

## STATEMENT OF FACTS

On October 30, 2012, President Obama declared New York a major disaster area due to Hurricane Sandy.  First Amended Class Action Complaint ("Compl.") ¶ 44.  The storm caused a massive amount of hardship, inflicting nearly $20 billion in damages to the area.  *Id.* ¶ 45.  Those with disabilities were hit especially hard.  Declaration of Susan Dooha ("Dooha Decl.") ¶ 6. Many were displaced, lost medical equipment, or suffered trauma.  *Id.* ¶ 6.  Others lost electricity, food, and water.  *Id.* ¶ 6.  Disabled individuals often lacked medicine, care, transportation, or supplies, and some found themselves needing emergency assistance.  *Id.* ¶ 7.

D-SNAP is a public benefits program that provides one month of food assistance to eligible individuals affected by a natural disaster.  Compl. ¶¶ 3, 42.  It is extremely important for disaster survivors, many of whom endure food deprivation for the first time; and for many low-income individuals ineligible for food stamps ("SNAPs"), it is the only public benefit they receive.  Declaration of Catherine F. Bowman ("Bowman Decl.") ¶ 4.  The New York City Human Resources Administration ("HRA") estimates that each household receiving D-SNAP benefits will receive approximately $432.  Compl. ¶ 74.

On December 7, 2012, HRA announced that New York City had been approved for a D-SNAP program in response to Hurricane Sandy.  *Id.* ¶¶ 46; Bowman Decl. ¶ 7.  The program would begin in just five days and run for only seven—between December 12-18, 2012.  Compl. ¶¶ 46; Bowman Decl. ¶ 7.  Eligibility was limited to residents of twelve zip codes in New York.  Compl. ¶ 47, 9.

The D-SNAP program required individuals to apply for benefits *in person* during the short application period.  *Id.* ¶ 48.  There was only one main site available to apply, located in Fort Greene, Brooklyn.  *Id.* ¶¶ 49, 12; Declaration of Joel S. Berg ("Berg Decl.") ¶ 25; Bowman Decl. ¶ 12.  A satellite site in Staten Island was open only on a part-time basis from December 14 to 17.  Compl. ¶¶ 49, 12; Bowman Decl. ¶ 12.  Travel times by public transportation ranged from approximately thirty to ninety minutes, depending on where the individual resided.  Compl. ¶ 66; Dooha Decl. ¶ 9.  For those needing wheelchairs, travel took even longer.  Compl. ¶ 66.

By contrast, in New Jersey's D-SNAP program for Sandy victims, there were over 70 application sites, with some boroughs having up to ten in the form of senior centers, libraries, firehouses, shelters, social services offices, and outreach sites.  Compl. ¶ 51; Bowman Decl. ¶ 15.  Likewise, in neighboring Westchester County, D-SNAP applications were accepted at five different sites.  Compl. ¶ 52; Bowman Decl. ¶ 13.  Similar flexibility was evident after other comparable storms: following Hurricane Isaac, every affected Louisiana parish had at least one application site, and several had two; after Hurricane Ike, Austin, Texas alone provided three locations to apply.  *Id.* ¶ 15.

Transportation obstacles were unprecedented in New York City in the aftermath of Hurricane Sandy.  Thousands of eligible people resided outside of Brooklyn and Staten Island, and many lived in Far Rockaway, *id* ¶ 50, where transportation became particularly challenging

for those with disabilities. Dooha Decl. ¶ 9; Bowman Decl. ¶ 13.  Post-Sandy, there was no subway to or from Far Rockaway; there was only an MTA shuttle bus  to a station where the elevators were not working due to the storm.  Thus, that station was not usable by many people with disabilities. Dooha Decl. ¶ 9.  Access-a-Ride—the MTA paratransit service which is only available to those who have previously applied and been approved—also was often unavailable after the storm.  Moreover, even in ordinary times, Access-a-Ride service must be scheduled in advance; drivers are unable to wait until a user completes a multi-stage application process like the D-SNAP procedure.   Access-a-Ride therefore was not a viable option for plaintiffs, whose return home from the D-SNAP application site could not be predicted and scheduled.  *Id.* ¶ 9.

An hourly shuttle bus to and from one location in Far Rockaway, organized by the Defendants, did little to offset the program design flaws.  The large parking lot used for this purpose lacked signage indicating where to find and board the shuttle.  Old-fashioned school buses without wheelchair lifts were used, despite Defendants' assurance to advocates, and representations to the public, that the shuttle would have accessibility features to accommodate wheelchairs, walkers, and other assistive devices.  Berg Decl. ¶ 50–51.  It was unclear how disabled applicants would be accommodated when they arrived at the sites.  Bowman Decl. ¶ 24.

In the regular SNAP program, disabled individuals are accommodated by an application process that uses telephones, faxes, the internet, mail, and home visits whenever necessary.  Compl. ¶ 57, 15, 14.  None of these accommodations were incorporated into the D-SNAP program to make it accessible to those with disabilities.  *Id.* ¶ 58.   The only accommodation offered for disabled individuals was to use a surrogate as an authorized representative.  Dooha Decl. ¶ 10; Bowman Decl. ¶ 26.  This accommodation was severely flawed in several respects.

First, to apply through a representative, a disabled individual had to disclose sensitive information to that person, including a social security number, financial data, and supporting documentation.  Compl. ¶ 68.  Individuals with disabilities are often abused by those they entrust with financial information, so they are advised not to disclose it to others.  Dooha Decl. ¶ 12.

Second, someone agreeing to serve as an authorized representative was required to attest to the truth of all statements made under penalty of perjury and could be asked to answer specific questions about any item in the application.  Bowman Decl. ¶ 28.  Because it is hard to attest to another's truthfulness without an investigation, adherence to such a requirement likely prevented many people and organizations from serving as representatives.  *Id.* ¶ 28.

Finally, even if they were willing to apply through a representative, many disabled individuals simply did not have someone to whom to turn.  *See, e.g.*, Declaration of XT ("X.T. Decl.")  ¶ 4; Declaration of Renee Moore ("Moore Decl.") ¶ 8.  On the last two days of the program, HRA suddenly reversed course and told those who went to Restoration Centers that they could give their personal information to workers at the Center, who in turn would find a non-profit provider to be their representative.  Dooha Decl. ¶ 13.  HRA conducted virtually no outreach to inform those with disabilities about this new application option, *id.* ¶ 13, and non-profit organizations did not learn of it until the weekend of December 15, just days before the program ended.  Berg Decl. ¶¶ 40-41; Bowman Decl. ¶ 34.

In fact, HRA relied on separate application sites, rather than the many existing HRA offices, due to its concern about massive crowds of applicants.  Berg Decl. ¶ 46; Bowman Decl. ¶ 16.  Yet only a small number of disabled individuals ultimately applied, indicating that HRA's public outreach had failed.  Berg Decl. ¶¶ 46-48.  While the Defendants had projected that some 30,000 individuals could benefit from the program, Declaration of Kenneth Stephens ("Stephens

Decl.") ¶ 2, Ex. 1 at 8, approximately 6,000 had applied on December 19, 2012, after the

program had ended, *see* Ex. C to Supplemental Declaration of Roy A. Esnard in Further

Opposition to Plaintiffs' Request for a Temporary Restraining Order/Preliminary Injunction.

Many would-be applicants with disabilities were unnecessarily denied access to much-needed

benefits that would have helped them feed themselves and their families because of the

Defendants.  Compl. ¶¶71, 75.  The named Plaintiffs are just four of the many unfortunate

victims of this tragedy.

 Ms. Toney-Dick suffers from pulmonary disease, multiple sclerosis, hyperthyroidism,

chronic arthritis, and hip pain, all of which severely limit her mobility and breathing.

Declaration of Alechea Toney-Dick ("Toney-Dick Decl.") ¶ 2.  She uses a wheelchair to move

around her house, and she cannot go downstairs unless she is carried by her husband.  *Id.* ¶¶ 2-3.

Ms. Toney-Dick's total monthly household income is less than $3,400.  *Id.* ¶ 5.  Yet due to

Hurricane Sandy, her home suffered incredible damage, and she had to spend over $500 in out-

of-pocket expenses on hotels, meals, and other items.  *Id.* ¶¶ 6-8.  Ms. Toney-Dick was unable to

travel to the applications sites because of her disability.  *Id.* ¶¶ 13-14.

 Ms. Hanan suffers from a seizure disorder, rheumatoid arthritis, chronic irritable bowel

syndrome, gastroesophageal reflux disease, and depression.  Declaration of Sherry Hanan

("Hanan Decl.") ¶ 3.  Because of her impairments, it is extremely difficult for her to be in

crowded situations.  *Id.* ¶ 4-5.  Ms. Hanan's house was severely damaged by the hurricane, and

she and her father were evacuated.  *Id.* ¶ 2.  She was forced to live in a hotel funded by FEMA,

with her household income not exceeding $3,000 per month.  *Id.* ¶¶ 2, 6.  Ms. Hanan was unable

to find someone to serve as her authorized representative.  *Id.* ¶ 8.  While her brother went to the

Brooklyn application site in her stead, he could not complete an application because computer problems had caused delays, and he was unable to wait in line any longer.  *Id.* ¶ 8.

Ms. Moore suffers from multiple disabilities, including dislocated discs, damaged nerves, asthma, heart problems, and high blood pressure.  Moore Decl. ¶ 2.  She cannot stand for long periods of time and uses a cane to move about.  *Id.* ¶ 2.  Ms. Moore also takes medications for these conditions, which make her drowsy and limits her ability to travel.  *Id.* ¶ 2.  Like all the other Plaintiffs, Ms. Moore was severely affected by Hurricane Sandy.  She had to evacuate her home and pay $100 for a cab ride to a friend's residence in the Bronx.  *Id.* ¶ 5.  She later returned to a home that lacked electricity and heat and then was hospitalized for carbon monoxide poisoning after trying to use her gas stove for warmth.  *Id.* ¶ 5.  Ms. Moore was unable to apply for D-SNAP benefits because her pain prevented her from traveling to Fort Greene.  *Id.* ¶ 8.  She could not find anyone else to act as her authorized representative.  *Id.* ¶ 8.

Finally, Ms. X.T. suffers from acute pulmonary hypertension, which affects her ability to breathe, stand, sit, and travel.  X.T. Decl. ¶ 2.  She is treated with intravenous medications 24-hours per day, and she cannot travel alone because she needs help carrying her IV in a medical pack.  *Id.* ¶ 2.  After Hurricane Sandy, Ms. X.T. was forced to relocate when she lost power, and she had to buy clothes for her children, purchase restaurant meals, and pay for a $50 cab ride home after power was restored.  *Id.* ¶ 5.  Ms. X.T. was unable to apply for D-SNAP benefits because her disability prevented her from traveling alone, and her home-health-aide was unable to accompany her.  *Id.* ¶ 4.

Plaintiffs X.T., Moore, and Hanan move for a preliminary injunction, which would afford them the relief that they desperately need.  They also seek to represent a class of similarly situated disabled individuals, all of whom have suffered from this terrible ordeal.

## ARGUMENT

**I.    PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE GRANTED.**

Plaintiffs must demonstrate the following to secure a preliminary injunction: "(1) that it will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor." *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 348–49 (2d Cir. 2003); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 462 (S.D.N.Y. 2010).  Plaintiffs meet this standard.

**A.    Class Members Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction.**

A showing of irreparable harm is "essential to the issuance of a preliminary injunction." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995).  "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (citation omitted).  Plaintiffs will suffer irreparable harm if a preliminary injunction is not issued.  They will be precluded from receiving essential assistance to purchase food—or drain their resources for other essential expenditures—each day that they cannot access benefits.  New York state and city officials, along with experts, have stressed that catastrophes can ravage New York again; if Defendants' discriminatory practices are not enjoined, Defendants will likely impose a similarly discriminatory and insufficient structure in any future D-SNAP program, causing irreparable harm, including physical harm, to Plaintiffs because of their disabilities.

Defendants' discrimination has precluded Plaintiffs from receiving public assistance they need to feed themselves and their families in the wake of catastrophe.  Second Circuit courts,

including this Court, have regularly found that "irreparable harm" occurs when people risk losing their ability to access such public assistance.  *See Reynolds v. Giuliani*, 35 F. Supp. 2d 331, 339 (S.D.N.Y. 1999) (finding a "risk of immediate and irreparable harm" to applicants for welfare benefits); *Morel v. Giuliani*, 927 F. Supp. 622, 635 (S.D.N.Y. 1995) (citations omitted) ("To indigent persons, the loss of even a portion of subsistence benefits constitutes irreparable injury."); *see also Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 209 (E.D.N.Y. 2000) (finding "irreparable injury" to applicants for subsistence benefits); *Brown v. Giuliani*, 158 F.R.D. 251, 264 (E.D.N.Y. 1994) ("[L]oss of even a small portion of welfare benefits can constitute irreparable injury . . . ."); *Willis v. Lascaris*, 499 F. Supp. 749, 760 (N.D.N.Y. 1980) (finding a "likelihood of irreparable injury" to recipients of food stamps).

The irreparable harm that Plaintiffs will suffer in the absence of injunctive relief will likely recur.[2]  Hurricane Sandy has caused incalculable damage to their lives, and they desperately need help.  The D-SNAP program, which covered the zip codes Defendants determined to have borne the brunt of the storm, was designed to alleviate this suffering.  Yet Plaintiffs' inability to apply for D-SNAPs due to their disabilities has unfairly denied them access to food—a basic life necessity they sorely need to survive.  *See Henrietta D.*, 119 F. Supp.

---

[2] While Hurricane Sandy may have been a "perfect storm," Mayor Michael Bloomberg recently noted that New York is a "coastal city" and cannot afford to ignore the fact that intense storms are "likely to increase" with rising sea levels.  *See* Press Release, New York City Mayor's Office, Mayor Bloomberg Delivers Address on Shaping New York City's Future After Hurricane Sandy (Dec. 6, 2012), *available at* http://www.nyc.gov/cgi-bin/misc/pfprinter.cgi?action=print&sitename=OM&p=1357599467000.  Expressing similar concerns, Governor Andrew Cuomo has charged New York State commissions on emergency preparedness with the ongoing and potentially life-saving task of ensuring that the state is prepared for future disasters.  *See* Matthew L. Wald & Danny Hakim, *Storm Panel Recommends Major Changes in New York*, N.Y. Times, Jan. 6, 2013, *available at* http://www.nytimes.com/2013/01/07/nyregion/new-york-state-storm-panel-recommends-major-changes.html?ref=nyregion& r=0.  Also, Irwin Redlener, a public health professor at Columbia University, has echoed New York officials' sentiments concerning safety and preparedness.  Professor Redlener has emphasized that New York will see "big disasters" in the future that require ongoing modifications to governmental leadership and control to protect "vulnerable people," like the "homebound."  Jimmy Vielkind, *Fuel Reserve Part of Study*, TimesUnion.com (Jan. 3, 2012, 10:30 PM), http://www.timesunion.com/local/article/Fuel-reserve-part-of-study-4166100.php.

2d at 209 (quoting *Goldberg v. Kelly*, 397 U.S. 254 (1970)) ("As the Supreme Court has explained, the failure to provide benefits may deprive an eligible recipient of the very means by which to live while he waits."); *Brown*, 158 F.R.D. at 264 ("For plaintiffs and members of the plaintiff class, public assistance benefits are the essential source of support that permit them to survive."); *Willis*, 499 F. Supp. at 759 ("Even a slight change in food stamp allotments effects [sic] a public assistance household's ability to procure the necessities of life." (citation omitted)). Plaintiffs continue to lack this essential assistance each day that Defendants continue depriving them.  Plaintiffs who ordinarily had enough resources to purchase necessities have, in the wake of Hurricane Sandy, had to pay significant out-of-pocket costs for food.  *See* Moore Decl. ¶ 6. Such out-of-pocket expenses have diverted their scant resources from other essential needs, such as shelter.  D-SNAP benefits would ease their unexpected hardship with resources to provide for themselves and their families, which was the program's purpose.  *See* Bowman Decl. ¶ 3–4.

The D-SNAP program required individuals who were not current SNAP recipients to apply in person at a D-SNAP application site.  Due to their disabilities, however, Plaintiffs were unable to travel to the nearest site—located in Fort Greene, Brooklyn—nor could they resort to using authorized representatives to apply on their behalf.   *See* Moore Decl. ¶ 8.  In fact, for named plaintiffs Alechea Toney-Dick and Renee Moore, who resided in the Rockaway area of Queens, travel times to the Fort Greene site exceeded more than one and a half hours each way by public transportation.  *See* Compl. ¶ 66; Dooha Decl ¶ 9. The hardship of this travel time was "magnified . . . by the physical and mental barriers to mobility that arise from Plaintiffs' underlying disabilities."  *Lovely H. v. Eggleston*, 235 F.R.D. 248, 262 (S.D.N.Y. 2006).  Even if Plaintiffs had been able to apply for D-SNAP by traveling to the application centers, and had thus received the relief offered by the program, "the additional travel burdens and obligations"

11

themselves put Plaintiffs "at risk of irreparable harm."  *See, e.g.*, X.T. Decl ¶ 2 (cannot travel

alone and needs an IV when she leaves home); Hanan Decl ¶ 4 (risk of seizures in crowded

places).

>    **B.      Plaintiffs Are Likely To Succeed On The Merits.**

To demonstrate a likelihood of success on the merits, Plaintiffs need "only make a

showing that the probability of [their] prevailing is better than fifty percent."  *Reynolds v.*

*Giuliani*, 35 F. Supp. 2d 331, 339 (S.D.N.Y. 1999) (citations omitted).  Indeed, likely success on

the merits may be adequately shown even where there is "considerable room for doubt" as to the

merits of a claim.  *Id.*   Plaintiffs more than satisfy this minimal showing, as Defendants' policy

of failing to reasonably accommodate disabled individuals under the D-SNAP program violates

the ADA, the RA, and the FSA, as well as New York state and city human rights and social

services laws

>    **1.      Defendants Violated the ADA, the RA, and State and Local**
>    **Anti-Discrimination Laws.**

Both Title II of the ADA and Section 504 of the RA prohibit discrimination against

disabled persons when providing public services.  *See* 42 U.S.C. § 12132 ("[N]o qualified

individual with a disability shall, by reason of such disability, be excluded from participation in

or be denied the benefits of the services, program, or activities of a public entity, or be subjected

to discrimination by any such entity."); 29 U.S.C. § 794 ("No otherwise qualified individual with

a disability in the United States . . . shall, solely by reason of her or his disability, be excluded

from the participation in, be denied the benefits of, or be subjected to discrimination under any

program or activity receiving Federal financial assistance . . . .").  State and City laws also bar

discrimination against those with disabilities.  *See* N. Y. Exec. Law § 296-2(a) (barring

discrimination in public accommodations); N.Y. Soc. Serv. Law  § 331(3) & 18 N.Y.C.R.R. §

303.1 (barring disability-based discrimination in programs administered by Social Services districts); N.Y. City Human Rights Law, § 8-107(4)(a) (barring disability-based discrimination in public accommodations).

To establish disability discrimination under the ADA[3], plaintiffs must demonstrate that "(1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from defendant['s] services, programs, or activities, or were otherwise discriminated against by defendant . . . , by reason of plaintiffs' disabilities." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). All three elements are present here.

> **(a)** **Plaintiffs Are Disabled Within the Meaning of the ADA, the RA, and State and City Anti-Discrimination Laws.**

As a threshold matter, each of the named Plaintiffs were all otherwise "qualified" to apply for the D-SNAP benefit because of the following: they were not receiving SNAP benefits for one or more persons in their household; they lived in the communities that were covered by the D-SNAP program; and they had out-of-pocket expenses as a result of the storm. Each of the named plaintiffs suffers from one or more disabilities under the ADA.

The ADA defines a disability as a mental or physical "impairment" that substantially limits an individual in at least one major life activity. 42 U.S.C. § 12102(1)(A); *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). Each plaintiff has at least one "impairment," which is broadly defined to include "condition[s]" or " loss[es]" affecting body systems such as the neurological, musculoskeletal, and respiratory systems as well as "mental or psychological disorder[s]." *See*

---

[3] Unlike the ADA, the RA requires that defendants be recipients of federal funds, 29 U.S.C. §794, but that requirement plainly is not at issue here. Moreover, New York's disability laws have been interpreted to require plaintiffs to make substantially the same showings of proof as the ADA. *See Bowen v. Rubin*, 385 F. Supp. 2d 168, 182 (E.D.N.Y. 2005). Therefore, Plaintiffs' analysis of their ADA claim includes parallel assertions under the RA, as well as under state and local anti-discrimination laws.

28 C.F.R. § 35.104 (2003).  For example, Plaintiff Toney-Dick's multiple sclerosis and Plaintiff X.T.'s severe pulmonary disease clearly suffice.

Plaintiffs' impairments also "substantially limit" them in major life activities, which include caring for one's self, walking, and interacting with others.  *See* 28 C.F.R § 35.104 (listing "major life activities"); *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 202 (2d Cir. 2004).  Plaintiffs' burden to show that a major life activity is substantially limited by their impairments is not a "demanding standard," and they need not show that impairments "significantly or severely restrict the individual from performing a major life activity in order to be considered substantially limiting."  29 C.F.R. §§ 1630.2(j)(2)(i)-(ii).

Each named Plaintiff's major life activities are sufficiently limited to satisfy this flexible requirement.  For example, Plaintiff Toney-Dick cannot leave her house without her husband's help to carry her down the stairs.  *See* Toney-Dick Decl. ¶ 3.  Similarly, Plaintiff X.T. cannot travel alone as a result of her pulmonary disease, *see* X.T. Decl. ¶ 2, and Plaintiff Moore has trouble walking.  *See* Moore Decl. ¶ 2.  Lastly, plaintiff Hanan's physical and mental impairments make it difficult for her to travel outside of her home or to be in crowded environments.  *See* Hanan Decl. ¶¶ 3-5.[4]

### (b)   Defendants Are Covered by the ADA, the RA, and State and City Anti-Discrimination Laws.

There is no question that Defendants are subject to the ADA, the RA, and parallel state and city laws.  *See* 42 U.S.C. § 12131(1) (defining "public entity" as a state or local government department, agency, or instrumentalities); 29 U.S.C. § 794(b)(1) (noting that defendants are "recipient[s]" of "federal financial assistance");  New York City Human Rights Law, Ch. 1, § 8-

---

[4]  Each plaintiff, clearly disabled under the ADA, also has a disability within the meaning of state and city laws barring disability discrimination, which define "disability" more broadly.  *Lovely H.*, 235 F.R.D. at 259.

102(9) (defining "persons" as "providers of public accommodation").  Therefore, Defendants'

public-benefits programs cannot exclude qualified persons with disabilities.

> (c)     **Defendants Discriminated Against Plaintiffs by Implementing**
> **The D-SNAP Program in Violation of the ADA, the RA, and**
> **State and City Anti-Discrimination Laws.**

Plaintiffs are likely to succeed in showing that they have been subject to unlawful

discrimination under the ADA by virtue of Defendants' policy of failing to reasonably

accommodate individuals with disabilities under the D-SNAP program.  The ADA protects

disabled individuals from discrimination in various forms, *see* 42 U.S.C. § 12132, and it must be

construed broadly to effectuate its anti-discriminatory purpose.  *Henrietta D.*, 119 F. Supp. 2d at

205.  Congress also directed the United States Department of Justice to issue regulations

implementing Title II.[5]  *See* 42 U.S.C. § 12134(a).

To comply with these requirements, grantees of public benefits or services must provide

disabled individuals "meaningful access" to services or benefits.  *Alexander v. Choate,* 469 U.S.

287, 301 (1985).  To ensure meaningful access, "reasonable accommodations . . . may have to be

made."  *Id.*  Such accommodations are necessary because "it is not enough to open the door for

the handicapped . . .; a ramp must be built so the door can be reached."  *Dopico*, 687 F.2d at 652.

In assessing whether a reasonable accommodation exists, the ultimate focus is on whether

disabled individuals have access to the benefits or services offered.  *Choate*, 469 U.S. at 301.

Public grantees need not alter the substance of their programs to provide this meaningful access,

---

[5]  Those regulations appear at 28 C.F.R. Part 35, Subpart B, *see* 28 C.F.R. §§ 35.130 *et seq.*, and closely track the regulations promulgated under Section 504 of the RA.  *See* 28 C.F.R. § 41.51.  In denying Plaintiffs access to accommodations to apply for D-SNAP benefits, defendants have violated several regulations under the ADA, including Sections (b)(1)(i)-(iii) (prohibiting public-service providers from providing unequal access and benefits to persons with disabilities) and Sections (b)(4)(i) and (ii) (prohibiting public-service providers from choosing sites that effectively exclude people with disabilities from participation and defeat the purpose of the program with respect to individuals with disabilities).  *See* 28 C.F.R. § 35.130.

but they must take steps to protect the rights of disabled individuals insofar as they already exist under the programs. *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70 (2d Cir. 2000).

While assessing "meaningful access" is a fact-intensive inquiry, "where the plaintiffs identify an obstacle that impedes their access to a government program or benefit, they likely have established that they lack meaningful access." *Wendel v. New York*, 574 F. Supp. 2d 290, 304 (E.D.N.Y. 2008) (citation omitted). Plaintiffs have identified many such obstacles embedded in the design and implementation of the D-SNAP program and have made suggested accommodations whose reasonableness is attested to by the fact that they are routinely used by the Defendants in their daily operation of the SNAP program. They are likely to succeed on their ADA claim for three reasons:

1. Defendants designed the D-SNAP program without regard to the needs of people with disabilities;
2. Defendants' "authorized representative" procedures were insufficient accommodations for people with disabilities; and
3. Plaintiffs have identified a range of reasonable accommodations.

### (1)   Defendants Designed the D-SNAP Program without Regard to the Needs of People with Disabilities.

In designing their D-SNAP program, Defendants ignored the obvious impact that their selection of a single application site in Fort Greene, Brooklyn (with just a part-time satellite office in Staten Island) would have on the ability of people with disabilities from other parts of New York City, particularly the Rockaways, to apply for the program. Defendants knew—or should have known—that there were thousands of mobility impaired and elderly residents of the Rockaways and elsewhere, for whom a trip to downtown Brooklyn would be a substantial, if not insurmountable, barrier to their participation. *See, e.g.*, Dooha Decl. ¶¶ 6-7, 9. Defendants' failure or refusal to establish one or more satellite application sites in the Rockaways and elsewhere contrasted with the D-SNAP plan in Westchester County, which had five application

sites, and New Jersey, in which the authorities used libraries, senior citizen centers, firehouses and shelters as satellite sites to facilitate applications with minimal travel.  Stephens Decl. ¶ 9, Ex. 8 (list of New Jersey application sites); *id.* ¶ 10, Ex. 9 at 4 (description of Westchester application sites).  The City's site-selection process ignored the Department of Justice's regulations designed to implement the ADA, including 28 C.F.R. §§ 35.130(b)(3)(i) (ii) and (b)(4)(i)(ii).  These regulations proscribe facility-siting decisions and other methods of administration that have the effect of subjecting individuals with disabilities to discrimination on the basis of their disability, denying them the benefit of the program, or "substantially impairing" the accomplishment of the objectives of the public entity's program with respect to individuals with disabilities—in this case, their ability to receive the emergency nutrition and financial support the D-SNAP program was intended to offer them.

> **(2)     The Defendant's "Authorized Representative" Procedures Were an Insufficient Accommodation for People with Disabilities.**

The principal "accommodation" that Defendants offered to people with disabilities was the "opportunity" to authorize a representative to serve as a surrogate for them and apply for D-SNAP benefits in person.  *See* Bowman Decl. ¶ 25; Dooha Decl. ¶ 10.  This was patently insufficient under the ADA.

First, forcing people with disabilities to rely on third parties should be a last—and certainly not the only—way in which to provide them meaningful access to a government-funded program.  Indeed, guidance from New York State underscores that the "authorized representative" option should never be the exclusive means by which an individual with disabilities can access the SNAP program.  "The local district may not at any time compel the household to appoint an authorized representative under any circumstance."  *See* Stephens Decl.

¶ 6, Ex. 5 at 1 (OTDA's General Information System Division message dated March 23, 2006, entitled "Food Stamp Policy Reminder: Authorized Reps are Chosen at HH Discretion").  Yet that is precisely what happened to the named plaintiffs and others: their *only* choice was to designate a surrogate or forego the hundreds of dollars in assistance for which they were entitled to apply.

Representatives had to have personal knowledge of the applicants' household circumstances, including their income and resources.  They also had to get the applicants' personal and financial information.  *See* Bowman Decl. ¶ 28.  Such a requirement, forcing Plaintiffs to share personal and confidential information with third parties, undermined Plaintiffs' meaningful access to the D-SNAP program.  *Cf. United Spinal Ass'n v. Bd. of Elections*, 2012 U.S. Dist. LEXIS 112474, at *4–18 (S.D.N.Y. Aug. 8, 2012) (finding no meaningful access to poll sites where disabled voters could not enter purportedly accessible sites without substantial aid from others); *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1049 (S.D.N.Y. 1995) (finding that "accommodations" made by a prison to enable hearing-impaired prisoners to receive medical benefits were insufficient in part because they forced the prisoners to share private medical information with third parties unbound by a duty of confidentiality).  Defendants' accommodation therefore granted access to D-SNAP benefits at the cost of undermining the rights and autonomy of disabled individuals.  *See* Dooha Decl. ¶¶ 2 & 11 (identifying the important goal of promoting autonomy for disabled individuals and noting that the authorized representative program did not enable disabled individuals to act independently).

Second, the manner in which the Defendants designed the D-SNAP program and the authorized-representative procedures imposed practical considerations that made this an ineffective accommodation even for people who might have been willing to use a surrogate to

apply.  Representatives had to travel the same long distances to one of only two application sites available, imposing a substantial burden for someone who might be otherwise willing to lend a hand.[6]  Authorized representatives also had to attest to the truth of the statements in the application they submitted, subject to penalty of perjury if information was inaccurate or incomplete.  *See* Bowman Decl. ¶ 26; *see also* Stephens Decl. ¶ 3, Ex. 2 at 3 (HRA's Press Release: "[A]pplicants, or authorized representatives applying on behalf of a household, who knowingly provide inaccurate or incomplete information as part of a D-SNAP application could face criminal prosecution and disqualification of benefits.").

        As a result of these impediments, it was extremely difficult for Plaintiffs to take advantage of this authorized representative "accommodation."  In *United Spinal Association v. Board of Elections*, the Court found "pervasive and recurring barriers to accessibility on election days at poll sites" even though the Board of Elections attempted to implement accommodations and even though some voters could, without difficulty and assistance, access the poll sites.  *See* U.S. Dist. LEXIS 112474, at *20–34 (granting injunctive relief requiring the Board of Elections to improve poll sites' accessibility).  In some of the cases at issue here, there simply was no one to whom Plaintiffs could turn.  *See* X.T. Decl. ¶ 4; Moore Decl. ¶ 8.  For example, Plaintiff Hanan's brother unsuccessfully tried applying on her behalf, but due to delays at the Brooklyn application site, he had to leave to keep a scheduled appointment and was thus unable to apply, leaving her with no other avenue to submit an application. Hanan Decl. ¶ 8.

        While the HRA eventually did allow Community Based Organizations to act as representatives at New York City Restoration Centers, they did so only on December 17, 2012— just *two days* before the D-SNAP program ended.  *See* Bowman Decl. ¶ 34.  Defendants also

---

[6]  HRA only had *limited* bus service from *one site* in the Rockaways at Mott Avenue and Beach 22nd Street to the Brooklyn application site.  The buses were not only limited, but also hard to find.  *See* Berg Decl. ¶ 23.

failed to participate in any significant outreach regarding this option.  *See* Berg Decl. ¶ 14; Bowman Decl. ¶ 35.  Even if they had promoted the program, however, such an alternative was infeasible considering its truncated duration.  *See* Berg Decl. ¶ 14.  Together, these obstacles rendered Defendants' sole accommodation as a woefully defective measure to ensure meaningful access to the D-SNAP program, and they instead reflect a "method of administration" that had the effect of "impairing the accomplishment of the program's objectives. . . ."  *See* Berg Decl. ¶ 14.

### (3)   Plaintiffs Have Identified a Range of Reasonable Accommodations

Finally, Defendants cannot claim the "authorized representative" option was the only reasonable accommodation.  Plaintiffs seeking to establish the absence of reasonable accommodations must also show that such accommodations were reasonable.  *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995).  To satisfy this requirement, however, it is "enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits."  *Id.*; *United Spinal Ass'n*, 2012 U.S. Dist. LEXIS 112474, at *29.

Plaintiffs have identified multiple modifications to the D-SNAP program that far exceeded the considerably low threshold from *Borkowski*.  For example, providing home visits for disabled applicants is specifically authorized in the guidance provided by the U.S.D.A. for the D-SNAP program, Stephens Decl. ¶ 8, Ex. 7, and allowing individuals with disabilities to apply online, by phone, or by fax would have been feasible accommodations, *see* Dooha Decl. ¶ 14, as they are already used in the SNAP program and specifically authorized by statute.  7 C.F.R. § 273.2(c)(1) & (e)(1)-(2).

The reasonableness of these accommodations is also reflected in the fact that, according to the Defendants' representations, they had raised the prospect of using such measures with their state counterparts. *See* Stephens Decl. ¶ 5, Ex. 4 at 23–24 (Ct. Tr., Dec. 12, 2012). There is, however, no written record of a specific request on the part of the Defendant to provide these alternatives as a means to accommodate people with disabilities, though USDA would likely give serious consideration to a formal request. Berg Decl. ¶ 61. That is precisely the relief plaintiffs seek here: Defendants should propose to the appropriate federal and state officials, such as OTDA, range of reasonable accommodations, including the same ones used in the regular SNAP program, so that New York City can comply with the ADA, and people with disabilities can access the program and receive the emergency assistance to which they are entitled. Such relief will disable the City Defendants from continuing to rest on their oars by intentionally avoiding asking the appropriate federal and state officials for authority to do so. *See* Hr'g Tr. 10:22-11:7, 14:2-14:15, 31:21-32:9, 34:4-34:18, Dec. 19, 2012. There is nothing in the record to suggest that these alternatives would be prohibitively burdensome or expensive to implement.

### 2. Defendants Violated the Food Stamp Act.

To demonstrate likely success on their claim under the FSA, Plaintiffs must show both that their federal rights were violated and that they have a private cause of action under 42 U.S.C. § 1983. *Reynolds*, 35 F. Supp. 2d at 340. They can do both in this case.

First, Plaintiffs' rights under the FSA were violated. Congress enacted the FSA to "safeguard the health and well-being" of individuals and families in poverty. *Id.* at 334 (quoting 7 U.S.C. § 2011). States participating in the FSA's federally funded programs must "provide timely, accurate, and fair service" to recipients to achieve Congress's objective and "best serve" eligible households. *Id.* (quoting 7 U.S.C. § 2011). When "some of the [c]ity's neediest

21

residents . . . fall through the safety net" provided by the FSA, the implementing authority has failed its obligations, and court action is necessary.  *Id.* at 342.

Plaintiffs accordingly are entitled to injunctive relief.  Not only did they suffer through a hurricane, but their daily lives already were substantially impaired by disability.  Yet due to the unusually restrictive and inflexible application requirements of the D-SNAP program, Plaintiffs were unable to receive the aid that was intended for them and sorely needed.  Defendants neglected their statutory duties by completely allowing these especially needy Plaintiffs to slip "through the safety net."  *Id.*

This violation of the FSA also created a private cause of action under 42 U.S.C. § 1983, which imposes liability on any person who, acting "under color of any statute, ordinance, regulation, custom, or usage of any State or Territory," deprives another person "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. Municipalities and officials sued in their individual capacities are "persons" under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978); *Hafer v. Melo*, 502 U.S. 21, 23 (1991).  In cases like this, the plaintiff must demonstrate that the challenged actions were taken pursuant to a governmental policy or, if not authorized by "written law," by government practices that are "so permanent and well settled as to constitute a 'custom or usage' with the force of law."  *Monell*, 436 U.S. at 691 (citations omitted).

Plaintiffs have a valid cause of action under Section 1983.  As discussed above, they are suing for violations of their federal rights established by the FSA.  *See* 7 U.S.C. § 2020(e)(14) (providing that a state agency, in designating a plan for SNAP benefits during a disaster, shall establish "application procedures to reduce hardship and inconvenience); 7 U.S.C. § 2020(e)(2)(B)(i) (providing that a state agency shall "provide timely, accurate, and fair service to

applicants for, and participants in, the food stamp program"). Defendants' actions resulting in these violations clearly were taken pursuant to formal, written government policies implemented for the D-SNAP program. Stephens Decl. ¶ 4, Ex. 3.

>    **C.    The Balance of Hardships Favors Plaintiffs.**

"A court must consider the balance of hardships between the plaintiff and defendant and issue an injunction only if the balance of hardships tips in the plaintiffs favor." *Rex Med. L.P. v. Angiotech Pharm. (U.S.), Inc.*, 754 F. Supp. 2d 616, 625 (S.D.N.Y. 2010) (citation omitted).[7]).

The balance tips decidedly in Plaintiffs' favor here. In the absence of an injunction, they will lose the opportunity to get the emergency benefits to purchase food that they and their families need. By contrast, Defendants' hardships would be far smaller if the requested relief were granted. Plaintiffs only seek an Order entailing that City Defendants make a formal request to the appropriate federal and state officials, such as OTDA, after engaging in good-faith discussions with Plaintiffs, to rectify the shortcomings in the original D-SNAP program. Such relief will disable the City Defendants from continuing to rest on their oars by intentionally avoiding asking such appropriate officials for authority to do so. *See* Hr'g Tr. 10:22-11:7, 14:2-14:15, 31:21-32:9, 34:4-34:18, Dec. 19, 2012. A plan should be instituted that would allow people with disabilities, who were unable to access the December 2012 program, to receive the emergency assistance provided for in the D-SNAP program through one or more of the means

---

[7] To the extent the court must consider "whether the public interest would not be disserved by the issuance of a preliminary injunction," *Bogoni v. Gomez*, 847 F. Supp. 2d 519, 527 (S.D.N.Y. 2012) (citation omitted); *see Rex Med. L.P. v. Angiotech Pharm. (U.S.), Inc.*, 754 F. Supp. 2d 616, 620 (S.D.N.Y. 2010), that requirement has been met. "The anti-segregation laws upon which Plaintiffs rely reflect important public policy commitments to equality and access." *Lovely H.*, 235 F.R.D. at 262. "The statutes and regulations embody strong statements of public policy prohibiting discrimination and differential treatment on the basis of disability." *Id.* Especially after the devastation left in the wake of Hurricane Sandy, denying Plaintiffs access to emergency relief only because of their disabilities would "turn back the clock . . . for a society that has made tremendous efforts and strides to improve, rather than constrict, accessibility for and integration of the disabled into all aspects of mainstream life." *Id.* (citation omitted).

plaintiffs have identified, such as providing for home visits to homebound applicants, allowing

Plaintiffs to file applications online, on the phone, by fax, through email, or at locations closer to

areas impacted by the storm.  Since any D-SNAP benefits that would be issued would be paid for

by federal dollars, and since the federal government generally reimburses states for 50% of the

administrative costs associated with the D-SNAP program, any administrative burden on the

Defendants is far outweighed by the Plaintiffs' needs and the importance of vindicating their

civil rights.  *Cf.*, *e.g.*, *Civic Ass'n of the Deaf of N.Y.City, Inc. v. Giuliani*, 915 F. Supp. 622, 636

(S.D.N.Y. 1996) (noting that "although the burden may be high, it does not rise to the level the

Department of Justice contemplated as undue in promulgating the Regulations under the ADA").

## II.     THE PROPOSED PLAINTIFF CLASS SHOULD BE CERTIFIED.

Plaintiffs move pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2) for

certification of a class consisting of the following members:

> All individuals in New York City who (a) have a physical or mental impairment
> that substantially limits one or more major life activities within the meaning of the
> ADA or have a record of such an impairment; (b) are eligible to apply for D-
> SNAP benefits; (c) reside in the covered zip codes for HRA's D-SNAP program;
> and (d) need reasonable accommodations to enable them to apply for D-SNAP
> benefits.

The proposed class easily satisfies the requirements of Rules 23(a) and (b)(2).  Class certification

is essential to the fair and efficient adjudication of this case, and Plaintiffs' motion therefore

should be granted. This Court and others in this Circuit routinely certify classes in similar cases

seeking to challenge a policy, custom, and practice relating to the administration of public

benefits, including food stamps. *See, e.g. M.K.B. v. Eggleston,* 445 F. Supp. 2d 400, 440–43

(S.D.N.Y. 2006) (certifying a class of immigrants eligible for public assistance, Medicaid, or

food stamps where benefits were denied or application was discouraged or withdrawn); *Williston*

*v. Eggleston*, 379 Supp. 2d 561, 562 (S.D.N.Y. 2005) (denying motions to dismiss where a class

consisted of food stamp recipients alleging that the State and the City of New York "have a policy and practice of failing to provide foods stamps in a timely manner"); *Lovely H.,* 235 F.R.D. 248; (certifying class of disabled recipients of public assistance, food stamps, and Medicaid).

### A.    The Class is So Numerous that Joinder of All Members Is Impracticable.

Federal Rule of Civil Procedure 23(a)(l) requires that the class be "so numerous that joinder of all members is impracticable."  Impracticability means difficulty or inconvenience of joinder, not impossibility of joinder; it does not mean impossibility of joinder.  *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993).  Generally, a class of as few as forty members meets the numerosity requirement.  *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995).  The proposed class easily meets this threshold.

Defendants estimated that as many as 30,000 individuals would benefit from the D-SNAP program, but less than 7,000 actually applied.  Therefore, there are at least 23,000 people who, by Defendants' own estimation, likely were eligible but never applied for hundreds of dollars or more to help feed their families and offset the financial impact of the storm.  Plaintiffs are seeking to represent those members of this unserved population who did not apply because Defendants designed a D-SNAP program that created unreasonable barriers for disabled persons and failed to provide the kind of reasonable accommodations that are commonly offered in the SNAP program.  The numbers undoubtedly are sufficient to meet the criteria for class certification, especially considering the circumstances of the putative class members in Hurricane Sandy's aftermath.  *See Brooklyn Ctr. for Independence of the Disabled v. Bloomberg*, __ F.R.D. ___, No. 11 Civ. 6690 (JMF), 2012 WL 5438849 at *4 (S.D.N.Y. Nov. 7, 2012) (courts must consider all of the circumstances in a case, as practicability is the touchstone of the

analysis).[8]   Especially given the conditions under which plaintiffs and the plaintiff class are

living, it is impracticable for each of them to get legal representation for their individual claims;

and the fact that the exact size of the class and identity of its members are unknown is no barrier

to class certification.  *Robidoux*, 987 F.2d at 935–36.

### B.      There are Questions of Law and Fact Common to the Plaintiff Class.

Federal Rule of Civil Procedure 23(a)(2) requires questions of law and fact common to

the class. This commonality requirement is easily satisfied here, as all Plaintiffs are alleging that

they have been harmed from the same policy decisions that impaired their ability to access D-

SNAP benefits.  Common questions include what accommodations were provided, whether the

provided accommodations were sufficient to meet Defendants' obligations under federal, state,

and city discrimination laws, and whether other accommodations Defendants failed to make

would have been "reasonable" under the governing statutes.  "[A]t issue is a City-wide policy

and its alleged failure to take into account the needs of disabled citizens. This issue is common to

the proposed class because it challenges 'acts and omission of the [City] that are not specific to

---

[8]  Defendants' data suggests, for example, that there are over 100,000 individuals living in the covered communities that have limitations severe enough to receive homecare services.  Stephens Decl. ¶ 7, Ex. 6.  It appears that the population of the covered areas represented approximately 5% of the total population of New York City. Declaration of Ryan P. Gelman ¶ 2, Ex. A., Fig. 1.  If the population of individuals receiving homecare services was similar in the covered areas as it is to the rest of the City, this would suggest a population of severely disabled individuals on the order of 5,000, though the number is likely higher.  If *even only 1%* of these homebound individuals were not receiving SNAP benefits and needed reasonable accommodations to apply for the program, that alone would be sufficient to meet the numerosity requirement.  *Consol. Rail Corp.*, 47 F.3d at 483 (citing forty class members as a threshold number).  Other class members have significant disabilities but would have been able to apply had the program design simply accounted for travel difficulties and provided for satellite application sites. Census data suggests that there are at least 100,000 individuals with disabilities, and nearly one-third of them are over 65.  *Id.* Fig. 2-3.  For example, nearly 17,000 seniors in just the Rockaways and Coney Island were identified as mobility-, or self-care impaired. *Id.* Fig. 5.  And it is highly unlikely that all of them were receiving SNAP benefits.  *Id.* (indicating only 33,000 households in all of the fully-covered zip codes were receiving SNAP benefits). Overall, there are more than one million individuals living in New York City who receive Medicaid benefits, but not SNAP.  Stephens Decl. ¶ 7, Ex. 6.  Again, using 5% to extrapolate an estimate of how many such individuals live in the covered areas, there are likely 50,000 or more.  Some percentage of these are people who would undoubtedly have a level of disabilities that would limit their capacity to travel long distances and apply in person, but who would be able to apply on their own if satellite sites and reasonable accommodations were provided.

any particular Plaintiff.'"  *Brooklyn Ctr.*, 2012 WL 5438849 at *7 (quoting *Raymond v. Rowland*, 220 F.R.D. 173, 180 (D. Conn. 2004)); *see also Lovely H.*, 235 F.R.D. at 256; *Henrietta D. v. Giuliani*, No. 95 CV 0641 (SJ), 1996 WL 633382 at *13-14 (E.D.N.Y. Oct. 25, 1996).

**C.   The Claims of the Named Plaintiffs are Typical of the Claims of the Plaintiff Class.**

Federal Rule of Civil Procedure 23 (a)(3) requires that class representatives' claims be typical of those of their class, and the typicality requirement "tend[s] to merge" with the commonality requirement.  *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n. 13 (1982). Typicality is easily established here, where each member's claim arises from the same course of events and each member makes similar legal arguments.  *Shakhness ex. rel. Shakhnes v. Eggleston*, 740 F. Supp. 2d 602, 625–26 (S.D.N.Y. 2010).  Also, like commonality, typicality does not require that representatives' claims be identical to those of their class.  *Robidoux*, 987 F.2d at 937.   In this case, named Plaintiffs have experienced an injury traceable to a "unitary course of conduct by a single system": requirements that, in the total absence of reasonable accommodations, barred them from applying for D-SNAP benefits.  *Brooklyn Ctr.*, 2012 WL 5438849, at *8.  Thus, the typicality requirement has been met.[9]

**D.   The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Plaintiff Class.**

Federal Rule of Civil Procedure 23(a)(4) requires the following: (1) "class counsel is qualified, experienced, and generally able to conduct the litigation"; and (2) the named Plaintiffs'

---

[9] Although members of the Plaintiff class may suffer from different disabilities, this does not defeat commonality or typicality for the purposes of class certification.  Any such feeble argument ignores clear precedent on class certification and the ADA and similar disability laws; class certification depends on whether the claims are based on the same course of conduct by the defendant, such as that committed by the City Defendants, and not on minor variations among individual plaintiffs' fact patters.  *See, e.g., Lovely H.*, 235 F.R.D. at 256; *Alexander A. v. Novello*, 210 F.R.D. 27, 33-34 (E.D.N.Y. 2002); *Civic Ass'n of the Deaf of N.Y. City, Inc.*, 915 F. Supp. at 632-33; *Ray M. v. Bd. of Educ. of the City Sch. Dist. of N.Y. City*, 884 F. Supp. 696, 699-700 (E.D.N.Y. 1995).

interests are not antagonistic to those of the class. *Marisol A. ex. rel. Forbes v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997).  Both elements are satisfied here.

First, counsel Plaintiffs and the proposed Plaintiff class, The Legal Aid Society and Gibson, Dunn & Crutcher, LLP, will prosecute this action vigorously and competently.  The Legal Aid Society has experience litigating matters relating to public benefits, the SNAP program, and disability discrimination.  Gibson Dunn has significant depth and experience in the most-complex areas of litigation, and it is committed to using its expertise and resources to take on cases like this in the public interest.

Second, Plaintiffs' interests and those of their class members are wholly coextensive. Plaintiffs' legal claims arise from Defendants' same illegal conduct applicable to the entire class; accordingly, the proposed class representatives "possess sufficient interest to pursue vigorous prosecution of their claims." *Cortigiano v. Oceanview Manor Home for Adults*, 227 F.R.D. 194, 207 (E.D.N.Y. 2005).  Plaintiffs and the Plaintiff class seek injunctive relief to assure that Defendants provide reasonable accommodations and an opportunity to apply for D-SNAP benefits in a manner consistent with discrimination laws.  Such a request does not present conflicts among class members.

**E.     This Action Meets the Requirements of Federal Rule of Civil Procedure 23(b).**

Finally, the proposed class meets the two criteria for certification set forth in Federal Rule of Civil Procedure 23(b)(2).  First, Defendants' conduct or failure to act is generally applicable to the class.  Second, final injunctive or corresponding declaratory relief is requested for the class as a whole.  This Court and others have granted class certification pursuant to Rule 23(b)(2) in cases like this, where Defendants' failures to act for Plaintiffs' benefits was a result of institutional policies that frustrated the rights of vulnerable, disabled individuals to access

public benefits.  *See, e.g., Lovely H*, 235 F.R.D. at 257; *Henrietta D.*, 1996 WL 633382 at *14;

*Raymond*, 220 F.R.D. at 180.

The unfortunate hardships outlined in the named Plaintiffs' affidavits are foreseeable

results arising from the very genesis of the D-SNAP program; the needs and rights of the

disabled were barely acknowledged, much less accommodated.  Accordingly, Defendants'

corresponding legal violations are applicable to all members of the class.  None of the named

Plaintiffs were able to apply for the D-SNAP program using the meager accommodation that

Defendants had provided.[10]  *See* Moore Decl. ¶ 8; X.T. Decl. ¶ 4; Hanan Decl. ¶ 8.  Under Title II

of the ADA and its implementing regulations, Defendants' obligation to provide class members

with meaningful access to the D-SNAP program was a legal mandate—not simply a matter of

administrative grace.  The requested relief is vital to ensure that Plaintiffs' rights are vindicated,

so all eligible New Yorkers have an opportunity to apply for and receive critically-needed

emergency benefits to help them purchase food.

## CONCLUSION

For the foregoing reasons, the relief requested in Plaintiffs' Motion for a Preliminary

Injunction and Class Certification should be granted.


Dated: New York, New York


January 7, 2013

**GIBSON, DUNN & CRUTCHER LLP**

---

[10] Ms. Toney-Dick was able to apply for D-SNAP benefits only at the last minute when Defendants accepted an application from the Legal Aid Society acting as her authorized representative, where that application did not attest to the truthfulness of the statements made in it.

29

By: <u>/s/ Randy M. Mastro</u>
     Randy M. Mastro, SBN 1792548

200 Park Avenue
New York, NY  10166-0193
Telephone:      212.351.4000
Facsimile:       212.351.4035

**THE LEGAL AID SOCIETY**

By:<u>/s/Kenneth Stephens</u>
     Kenneth Stephens

199 Water Street
New York, NY  10038-3526
Telephone:      212.577.3988

*Attorneys for Plaintiffs*

Steven Banks
Attorney in Charge
THE LEGAL AID SOCIETY
Adriene Holder
Judith Goldiner
Kenneth Stephens
Sumani Lanka
Kathleen Kelleher
Susan Welber
Susan Sternberg
Temporary Address and
Phone Number:
111 Livingston Street, 7th Floor
Brooklyn, NY 11203
Telephone: 646/761-9291
Fax: 718/722-3093

*Attorneys for the Plaintiff*

MEMORANDUM OF LAW.DOCX