UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

ALECHEA TONEY-DICK, individually and
on behalf of all others similarly situated,
et al.,

                                        Plaintiffs,

                    -v-

ROBERT DOAR, in his official capacity as
Commissioner of the New York City Human
Resources Administration, et al.,

                                        Defendants.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: NOV 1 4 2013

12 Civ. 9162 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

This action involves the Disaster Supplemental Nutrition Assistance Program ("D-SNAP") that was implemented in New York City following Hurricane Sandy ("the Sandy D-SNAP," "the Program," or "the D-SNAP").

Plaintiffs Alechea Toney-Dick ("Toney-Dick"), X.T., Renee Moore ("Moore"), and Sherry Hanan ("Hanan"), individually and on behalf of all others similarly situated (collectively, "plaintiffs"), allege that defendants Robert Doar, in his official capacity as Commissioner of the New York City Human Resources Administration ("HRA") and HRA (together, "the city defendants"), Kristin M. Proud, in her official capacity as Acting Commissioner of the New York State Office of Temporary and Disability Assistance ("OTDA") and OTDA (together, "the state defendants"), and Tom Vilsack, in his official capacity as Secretary of the United States Department of Agriculture ("USDA") and USDA (together, "the federal defendants"), designed, approved, and administered the Sandy D-SNAP in a discriminatory manner,

violating local, state, and federal law. (See Am. Compl. ¶ 2, dated Mar. 29, 2013, ECF No. 41.)[1]

Currently pending before this Court is the federal defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), which was filed on June 12, 2013 and fully briefed on August 1, 2013. For the reasons set forth below, the Court GRANTS that motion.

## PROCEDURAL HISTORY

On December 17, 2013, plaintiffs filed their Complaint (see ECF No. 1) and on December 21, 2012, plaintiffs filed their first amended Complaint. (See ECF No. 10.) On January 8, 2013, plaintiffs filed a motion for a preliminary injunction and a motion to certify the class. (See ECF No. 14.) On January 17, 2013, the city defendants filed a motion to dismiss. (See ECF No. 28.) On March 18, 2013, the Court issued a Memorandum Decision & Order granting in part the city defendants' motion and granting plaintiffs leave to file a second amended Complaint.[2] (See ECF

---

[1] Specifically, plaintiffs allege the following: all defendants are in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794, et seq.; the city and state defendants are in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, et seq.; the city and state defendants are in violation of the Food Stamp Act, 7 U.S.C. § 2020(e)(2)(B)(i) and (e)(11), as actionable under 42 U.S.C. § 1983; the city defendants are in violation of the New York State Human Rights Law § 296-2(a); the city defendants are in violation of New York State Social Services Law § 331 and 18 N.Y.C.R.R. § 303.1(a)-(b); and the city defendants are in violation of the New York City Human Rights Law.

[2] In that Memorandum Decision & Order, the Court held that OTDA and USDA were necessary parties to the action and needed to be joined. (See 3/18 Order at 18-20.) The present decision is based on a more fully developed record; it also relies on the federal defendants' representation that should plaintiffs prevail on the ultimate

No. 38.)  On March 29, 2013, plaintiffs filed a second amended Complaint.  (See ECF No. 41.)

On May 5, 2013, plaintiffs filed a second motion to certify the class (see ECF No. 47), which the Court granted on September 16, 2013.  (See ECF No. 108.)  On June 12, 2013, the city defendants filed an Answer (see ECF No. 65), and on June 12, 2013, the federal defendants filed the motion to dismiss that is currently before this Court.  (See ECF No. 67.)  Thereafter, the state defendants filed a motion to dismiss (see ECF No. 70) and the city defendants filed a motion for judgment on the pleadings (see ECF No. 75), both of which were denied by the Court on the record at a September 20, 2013 oral argument and in a written Order issued September 23, 2013.  (See ECF No. 111.)

## FACTUAL BACKGROUND

D-SNAP is a public benefits program that provides a one-time SNAP/Food Stamp benefit to assist eligible individuals in paying for one month's worth of food. (Id. ¶ 51.)  D-SNAP is administered at the federal level by the USDA Food and Nutrition Service ("FNS"); it provides federal funds to state and local recipients pursuant to the Robert T. Stafford Disaster Relief and Emergency Assistance Act,

---

question of liability, the federal defendants "will not oppose disbursing funds up to the Federal Government's share of the amount necessary to provide D-SNAP benefits for disabled individuals" who were eligible for the Sandy D-SNAP but unable to apply due to a lack of reasonable accommodations.  (See Fed. Defs.' Mem. at 24-25, dated June 12, 2013, ECF No. 67.)

Pub. Law No. 93-299, 42 U.S.C. § 5179, and the Food Stamp Act and accompanying regulations, 7 U.S.C. § 2014(h), 7 CFR § 280.  (Id. ¶¶ 3, 12.)

State agencies design their own (general) D-SNAP plans and update them annually.  (Declaration of Kenneth Stephens ("Stephens Decl."), Ex. 7 at 12, dated May 13, 2013, ECF No. 55.)  When a disaster strikes, a state evaluates the need for a D-SNAP and if desired, submits a request to FNS to operate a D-SNAP.  (Id.)

On October 29, 2013, Hurricane Sandy hit the east coast, causing an estimated $20 billion in economic damages and disrupting the lives of countless New Yorkers.  (Am. Compl. ¶ 54; Stephens Decl., Ex. 1 at 6.)  On October 30, 2012, President Obama declared New York a major disaster area as a result of the hurricane.  (Am. Compl. ¶ 53.)

Throughout November of 2012, the city, state, and federal defendants engaged in numerous communications concerning the possibility of implementing a D-SNAP.[3]  For example, on November 6, 2012, James Arena-DeRosa, the Northeast Region Administrator of FNS, sent an email to Elizabeth Berlin from OTDA providing OTDA with information about what it should consider in deciding whether to implement a D-SNAP in New York City.  (Decl. of Humani Lanka ("Lanka Decl."), Ex. 5, dated July 19, 2013, ECF No. 81.)  Arena-DeRosa stated: "We in FNS of course will support NY/NYC and your counties in whatever path you choose – but in my role in giving you the panoply of considerations I thought it

---

[3] To implement a D-SNAP program, HRA (i.e., the city defendants) must make a request to OTDA (i.e., the state defendants), setting forth its plan.  (Id. ¶ 52.) OTDA then submits that plan to FNS (i.e., the federal defendants) for approval. (Id.)

might be of value to get [a helpful perspective] if D-SNAP evolves as a serious consideration."  (Id.)  In response, Phillip Morris of the OTDA responded:  "James – we would like to take you up on your offer to convene a call and invite all of the eligible D[-]SNAP counties."  (Id., Ex. 5.)

On November 8, 2013, a conference call occurred between the USDA and OTDA.  (See Declaration of Tara M. LaMorte ("LaMorte Decl."), Ex. A, dated Aug. 1, 2013, ECF No. 89.)  During that call, Bill Ludwig, the Regional Administrator of the USDA Southwest Regional Office, shared his experience conducting a D-SNAP following Hurricane Isaac.  (Id.)  Thereafter, on November 17, 2013, Arena-DeRosa sent an email to Commissioner Doar with a subject line "touching base on where you are in thought process on [D-SNAP]."  (Lanka Decl., Ex. 3.)  The email explained that "if there is anything you need from [FNS] let me know; [D-SNAP] waivers/plains do take a little time to review and negotiate with the state and we want to make sure we have all the right people available."  (Id.)  Arena-DeRosa further stated that "it would be great to sort out details with [the State] and [FNS] on [M]onday/[T]ues[day] 19/20."  (Id.)  Similarly, on November 23, 2012, Arena-DeRosa sent an email to various individuals from the city and state explaining that "planning a D-SNAP requires consider[able] dialogue and back and forth and a lot of planning.  Unlike some waiver approvals, even after the DSNAP application is received by FNS there is a lot of dialogue that take[s] place between city – state – and FNS."  (Id.)

On November 28, 2012, the state defendants submitted their official request[4] on behalf of the city defendants to the federal defendants to operate and administer a D-SNAP in New York City. (Am. Compl. ¶ 3; see also Stephens Decl., Ex. 1 at 6-15.)  The proposed D-SNAP covered eligible individuals residing in 12 zip codes throughout Queens, Brooklyn, Manhattan, and Staten Island.[5]  (Am. Compl. ¶ 9.) The proposal called for one main location located in Brooklyn and an additional possible satellite location in Staten Island. (Stephens Decl., Ex. 1 at 8.)

After the proposal was submitted, the dialogue between the city, state, and federal defendants continued.  Indeed, on November 29, 2012, Denise Daly of FNS sent an email to various individuals from the city, state, and federal agencies stating:

> One significant area of concern is that only one designated D[-]SNAP site has been chosen with the possibility of adding an additional satellite site in Staten Island.  With the number of potential applicants, we don't believe that one site is practical and strongly urge you to consider adding the one additional site in Staten Island and perhaps consider if additional location(s) is necessary.

(Lanka Decl., Ex. 13.)[6]  On November 30, 2012, Arena-DeRosa sent another email to the city and state defendants stating that it was "[g]ood to chat with everyone" and

---

[4] FNS received the request on November 29, 2012. (See Declaration of Jessica Shahin ("Shahin Decl.") ¶ 8, dated June 12, 2013 ECF No. 69.)

[5] The Program was open to residents of ten complete zip codes in Coney Island (11224 and 11235), Red Hook (11231), Far Rockaway (11691, 11693, 11694, and 11697), the southeastern shore of Staten Island (10306), and lower Manhattan (10002). (Am. Compl. ¶ 56.) Additionally, two partial zip codes were covered: 11229 in Coney Island and 10305 in Staten Island. (Id.)

[6] This e-mail was then forwarded from Tom Hedderman at the OTDA to other individuals at the OTDA. (See Lanka Decl., Ex. 13.) Hedderman wrote: "USDA-

stated that the federal defendants would wait until December 3, 2012 to approve the proposed D-SNAP because it would allow "a little more time to iron out details and [ ] provide better time and space [for] communicating[,] etc." (Id., Ex. 8.)

On December 3, 2012, FNS sent a letter to OTDA approving the Sandy D-SNAP Program. (See Shahin Decl. ¶ 8, Ex. A.)[7] Following the approval, the city, state, and federal defendants continued to communicate about the design and implementation of the Program. For example, on December 5, 2012, an individual from OTDA sent an email to Arena-DeRosa, with various individuals from the city and state copied, explaining that two application sites were going to be utilized. (Lanka Decl., Ex. 4.) The email also referenced a November 30, 2012 conversation with the federal defendants and requested approval from the federal defendants for the "dates and timeframes that HRA is planning" for the satellite location in Staten Island. (Id.) A few days later, on December 7, 2012, Arena-DeRosa sent an email to the city and state defendants stating:

> Sites – . . . FNS approval did encourage the exploration of more sites – and it was good to see Staten Island added. If the initial client numbers look high NYC could ask to extend hours, open an alternative site, or extend the number of days.
>
> . . .
>
> Disability Access – thanks for your willingness to explore flexibility should we grant it . . . . The current rules do

HQ doesn't think that the one site or even two is sufficient. However, they likely will approve regardless." (Id.)

[7] On December 7, 2012, it was announced that the D-SNAP program was approved by the federal defendants and that the application period would begin on December 12, 2012. (Am. Compl. ¶ 55.)

> state that DSNAP is either face-to-face in person or by a
> representative, so we will let you know as soon as we hear
> something and we will be sure to let the State know of
> any additional flexibilities that might be available in
> [these] circumstances.

(Id., Ex. 6.)[8]  Additionally, between December 7, 2012 and December 10, 2012, the

federal and city defendants corresponded concerning the intake procedure that was

to be utilized.  (Pls.' 9/27 Ltr., Ex. A, dated Sept. 27, 2013, ECF No. 113.)

The Sandy D-SNAP program launched on December 12, 2012; it ran until

December 18, 2012 with one full-time location in Fort Greene, Brooklyn, and from

December 14-17, 2012 at a part-time location in Staten Island.  (Am. Compl. ¶¶ 4,

13.)  While regular SNAP programs allow certain applicants to apply online, by

phone, email, fax, mail, or home visit, the Sandy D-SNAP did not provide such

alternative application procedures.  (Id. ¶¶ 13, 17, 18, 68, 69.)[9]

Throughout the application period, the city, state, and federal defendants

continued to communicate with each other.  For example, on the date of the launch,

December 12, 2012, Arena-DeRosa emailed individuals from both the city and the

state confirming a meeting for the city, state, and federal defendants to occur on

December 17, 2012.  (Lanka Decl., Ex. 9.)  Also on December 12, 2012, the state

defendants emailed the state and city defendants discussing accommodations being

made for the elderly and disabled.  (Pls.' 9/27 Ltr., Ex. E.)

---

[8] On December 7, 2012, FNS received notice from Kenneth Stephens, a Supervising
Attorney at the Legal Aid Society, of potential problems related to disability access
for Sandy D-SNAP applicants.  (See Lanka Decl., Ex. 11.)
[9] The D-SNAP application process did allow for the use of authorized
representatives.  However, at least some members of the class were "not able to get
authorized representatives to apply on their behalf."  (Am. Compl. ¶ 5 n.1.)

ALLEGATIONS

According to plaintiffs, the city, state, and federal defendants failed to make reasonable accommodations for eligible individuals with disabilities. Specifically, plaintiffs contend that the following failures on the part of defendants violated the law:  (1) failure to provide additional easily accessible application sites (see id. ¶¶ 19, 58-63, 85); (2) disallowance of alternative application mechanisms (id. ¶¶ 68-69); (3) refusal to provide for an extended application period (id. ¶ 20); and (4) failure to conduct adequate outreach (id.).

With respect to the motion currently before the Court – concerning plaintiffs' allegations specifically against the federal defendants – plaintiffs allege that the federal defendants violated Section 504 of the Rehabilitation Act of 1973 and its implementing regulations.  (Id. ¶¶ 134, 139.)  Specifically, plaintiffs argue that the federal defendants "were aware of the fact" that the D-SNAP did not sufficiently provide reasonable accommodations in accordance with the law and nonetheless continued to fund and otherwise support the D-SNAP.  (Id. ¶ 85.)  Additionally, plaintiffs argue in more general terms that the federal defendants were actively engaged in the design and implementation of the D-SNAP, such that they too are responsible for the allegedly discriminatory nature of the Program.[10]

In their motion to dismiss, the federal defendants argue pursuant to Rule 12(b)(1) that plaintiffs cannot establish subject matter jurisdiction because the Rehabilitation Act does not afford a private right of action against federal funding

---

[10] This position is more clearly articulated in plaintiffs' opposition to the federal defendants' motion to dismiss than in the second amended Complaint.

agencies. (See Fed. Defs.' Mem. at 1.) As an alternative argument, the federal
defendants argue that plaintiffs lack standing to maintain their Rehabilitation Act
claim against the federal defendants and accordingly, the action must be dismissed
as to them. (Id.)

In opposition, plaintiffs argue that an implied private right of action is
available under the Rehabilitation Act because the federal defendants "were
actively involved in shaping the distribution of [the D-SNAP] benefits," and that the
federal defendants "actively discriminated against New York City's needy and
disabled . . . ." (Pls.' Mem. at 2, dated July 19, 2013, ECF No. 78.) Plaintiffs further
argue that they have standing because the harm they suffered is "fairly traceable"
to the conduct of the federal defendants. (Id. at 16-20.)

## LEGAL FRAMEWORK

### I.     Rule 12(b)(1)

Under Rule 12(b)(1), a case may be dismissed for lack of subject matter
jurisdiction when the district court "lacks the statutory or constitutional power to
adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing
Fed. R. Civ. P. 12(b)(1)). The court must accept a plaintiff's factual allegations in
the complaint as true and draw all reasonable inferences in plaintiff's favor. See
Famous Horse, Inc. v. 5th Ave. Photo, Inc., 624 F.3d 106, 108 (2d Cir. 2010). In
other words, plaintiff must "allege facts that affirmatively and plausibly" suggest
that jurisdiction exists. Amidax Trading Grp. v. S.W.I.F.T. SCRL, 671 F.3d 140,

145 (2d Cir. 2011); see GMA Accessories, Inc. v. Dorfman–Pacific Co., Inc., No. 11

Civ. 3731, 2012 WL 899385, at *3 (S.D.N.Y. March 16, 2012) (explaining that

dismissal is proper "when the complaint fails to allege sufficient allegations to

support subject matter jurisdiction"). To survive a motion to dismiss under Rule

12(b)(1), a plaintiff has the burden of proving jurisdiction by a preponderance of the

evidence. Makarova, 201 F.3d at 113 (citing Malik v. Meissner, 82 F.3d 560, 562

(2d Cir. 1996)).

In deciding a Rule 12(b)(1) motion, the Court draws on both the well-pleaded

facts from the complaint – including the documents attached thereto and

incorporated therein – assuming such facts to be true, and construing reasonable

inferences in plaintiff's favor, and on relevant evidence from outside the pleadings.

Amidax Trading Grp., 671 F.3d at 145; Makarova, 201 F.3d at 113; City of

Newburgh v. Sarna, 690 F. Supp. 2d 136, 141 (S.D.N.Y. 2010); see also State Emps.

Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 75 n.4 (2d Cir. 2007) ("The

distinction [between a Rule 12(b)(6) motion and a Rule 12(b)(1) motion] is

significant."); Robinson v. Government of Malaysia, 269 F.3d 133, 141 (2d Cir. 2001)

(explaining that when a defendant challenges a court's subject matter jurisdiction,

the court "must look outside the pleadings to the submissions" when they may

contradict the allegations in the complaint).

II.    Section 504 of the Rehabilitation Act

Section 504 of the Rehabilitation Act provides in part:

> No otherwise qualified handicapped individual in the
> United States . . . shall, solely by reason of his handicap,

11

> be excluded from the participation in, be denied the
> benefits of, or be subjected to discrimination under any
> program or activity receiving Federal financial assistance.

29 U.S.C. § 974. Section 504 was modeled on Title VI of the Civil Rights Act of

1964, 42 U.S.C. §§ 2000d et seq., and Title IX of the Education Amendments of

1972, 20 U.S.C. §§ 1681 et seq. See Marlow v. United States Dep't of Education,

820 F.2d 581, 582 (2d Cir. 1987) (citations omitted) (explaining that "courts

frequently construe section 504 with reference to Titles VI and IX" and that "in

1978, Congress amended section 505 of the Act, 29 U.S.C. § 794a(a)(2), to specify

that the enforcement scheme of Title VI also governs section 504"). Id. (citation

omitted).

      a.  Explicit Private Right of Action

"Section 603 of Title VI, 42 U.S.C. § 2000d-2 . . . sets out two avenues for

judicial review of agency decisions." Id. First, judicial review is available when an

agency decides to terminate or refuse to grant funding. Id. (citation omitted).

Second, an agency action is "subject to such judicial review as may otherwise be

provided by law for similar action taken by such department or agency on other

grounds." Id. (citing 42 U.S.C. § 2000d-2.)

Section 2000d-1 directs each federal agency that is empowered to distribute

federal funds to effectuate Title VI's anti-discrimination mandate through "rules,

regulations, or orders of general applicability" that govern federally funded

programs. 42 U.S.C. § 2000d-1. Funding agencies are obligated to ensure

recipients of aid comply with their rules and regulations; if they fail to do so, the

funding agency is supposed to first seek to secure voluntary compliance and if it is unable to do so, it is to terminate funding.  Id.

In this case, plaintiffs' allegations are not covered by either explicit cause of action provided for under the statutory framework.  The federal defendants have not decided to terminate or refuse to grant funding, nor do plaintiffs challenge the federal defendants' promulgation of – or failure to promulgate – "rules, regulations, or orders" prohibiting discrimination with respect to the Sandy D-SNAP.

Accordingly, no explicit cause of action is available as against the federal defendants.

### b.  Implicit Private Right of Action

In Cannon v. University of Chicago, the Supreme Court raised the possibility that an implied cause of action against a federal funding agency may exist under certain, limited circumstances.  441 U.S. 677, 706-07 n.41 (1979).  In the context of Title VI, the Court expressed hesitancy in allowing private actions against funding agencies in most circumstances – the Court believed such actions would be "far more disruptive . . . than a private suit against the recipient of federal aid could ever be."  Id.  Nevertheless, the Court left open the possibility that implied private causes of action against federal funding agencies could proceed under certain circumstances.  See id. at 717 (explaining that allowing a private right of action directly against a federal funding agency "is not inconsistent with an intent on [Congress's] part to have such a remedy available to the persons benefited by its legislation").

While some courts have read Cannon to preclude the existence of a cause of action against a federal funding agency, see, e.g., Jersey Heights Neighborhood Ass'n v. Glendening, 174 F.3d 180, 191 (4th Cir. 1999) (reasoning that while Cannon "approved an implied right of action against the recipients of federal funds . . . it is a different question altogether whether private parties may sue the federal funding agencies themselves"); Scherer v. United States, 241 F. Supp. 2d 1270 (D. Kan. 2003) (interpreting Cannon to preclude a private right of action against a federal funding agency), the Second Circuit has not foreclosed the possibility. See Marlow, 820 F.2d at 583; see also Cobb v. U.S. Dep't of Educ. Office for Civil Rights, 487 F. Supp. 2d 1049, 1053-53 (D. Minn. 2007) (explaining that while some courts have read Cannon to suggest that no implied cause of action exists as against a federal funding agency, Cannon is more properly interpreted to "merely indicat[e] disapproval of an implied cause of action to force the federal funding agency to terminate funds to a discriminating recipient") (citation omitted).

In Marlow, the plaintiff filed a complaint with the Department of Education's Regional Office for Civil Rights, alleging that the New York City Board of Examiners refused to hire him as a high school teacher in violation of Section 504 of the Rehabilitation Act. 820 F.2d at 582. The Regional Office for Civil Rights found that the Board of Examiners had not violated the Rehabilitation Act; Marlow appealed first to the district court and then to the Second Circuit. Id. at 582. Both the district court and the Second Circuit found that Marlow's suit had no basis – there was no explicit cause of action available under the circumstances, and the

14

Court held that no private right of action was available under Section 504 for "an individual complainant against a federal funding agency for review of an agency's finding of no discrimination." Id. at 583.

Nonetheless, the Marlow Court recognized that suits against federal funding agencies have been allowed in all of the following circumstances: the funding agency "consciously and expressly abdicated its enforcement duties;" the funding agency used "improper procedures for approving funded programs;" the funding agency "acquiesced or actively participated in discriminatory practices;" and the funding agency "wrongly refused to pursue further action when efforts to achieve voluntary compliance [had] failed." Id. at 583 (collecting cases). The Court stated that Marlow made no such allegations. Id. In so indicating, the Court implied that under circumstances more closely aligned with the cases cited, perhaps an implied cause of action against the federal funding agency would be available. Id.

As an example of a court allowing an implied private cause of action against a federal funding agency, the Seventh Circuit in Gatreaux v. Romney approved of such an action against United States Department of Housing and Urban Development ("HUD"), where HUD allegedly knowingly acquiesced in a Chicago municipal authority's racially discriminatory housing scheme. 448 F.2d 731, 739 (7th Cir. 1971).[11] In Gatreaux, the government admitted that between 1950 and 1969, HUD approved and funded low-income housing located in sites that were "not 'optimal'" because housing in preferable areas would have been stopped by the

---

[11] The Court notes that this case was decided prior to Cannon. Its rationale is nonetheless informative.

Chicago City Council – HUD made a policy determination "that it was better to fund a segregated housing system than to deny housing altogether to the thousands of needy [African-American] families of that city." Id. at 737.

The Gatreaux court discussed at length the degree of participation required to hold a federal agency accountable for discrimination, and noted that HUD played a "significant" role in the public housing projects at issue: "HUD retained a large amount of discretion to approve or reject both site selection and tenant assignment procedures of the local housing authority." Id. at 731, 739 (citing Hicks v. Weaver, 302 F. Supp. 619, 623 (E.D. La. 1969) where the court held that HUD's "own discriminatory conduct" provided a basis for suit because it had "effectively controlled each and every step in the program"). The court reasoned that "the fact that [HUD] is a federal agency or officer charged with an act of racial discrimination does not alter the pertinent standards, since it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government." Id. at 738 (citations omitted).

More recently, the District Court of Minnesota held in Cobb v. U.S. Department of Education Office of Civil Rights that "[a] cause of action exists when the funding agency served as a joint actor and assisted the funding recipient by nurturing the discriminatory conduct." 487 F. Supp. 2d 1049, 1054 (D. Minn. 2007) (citation omitted). In Cobb, the plaintiffs filed a complaint against federal funding agencies because the Minnesota State High School League, which received federal funds, allegedly "did not provide boys and girls with equal access to comparable

competitive facilities during the final round of the state hockey tournament." Id. at 1051. Plaintiffs further alleged that despite numerous complaints, the federal Office of Civil Rights "approved the League's decision to continue to hold the girls' tournament at the inferior facility for two years, and then to move the girls' tournament to another inferior facility." Id.

Citing to Marlow, the Cobb court refused to dismiss the federal funding agency from the lawsuit, holding that defendant's alleged conduct was one of the "narrow circumstances" in which an implied private cause of action should be found. 487 F. Supp. 2d at 1055. The court explained that plaintiffs asserted that the alternative venue for girls was "admittedly not comparable to the site where the boys' hockey tournament was held," and that the decision to continue to hold the girls' tournament at the inferior site was "guided" by the Office of Civil Rights; additionally, plaintiffs argued that the Minnesota State Hockey League "would have held the tournament in a different location if so directed by" the Office of Civil Rights. Id.; see also Young v. Pierce, 544 F.Supp. 1010, 1015 (E.D.Tex. 1982) (allowing action against federal agency for maintaining racially segregated housing in conjunction with local housing authority).

Nonetheless, a number of cases have, for a variety of reasons, declined to allow implied private rights of action to proceed against federal funding agencies. For example, in Bennett v. New York City Housing Authority, 248 F. Supp. 2d 166, 170-71 (E.D.N.Y. 2002), plaintiffs challenged HUD's "systematic failure to ensure that [the New York City Housing Authority] administers Section 9 programs in a

nondiscriminatory manner." Id. at 171.  The court refused to allow a private right of action against HUD to proceed because "HUD has in place an administrative mechanism for parties seeking additional regulations," which plaintiffs had failed to utilize.  Id.

In Women's Equity Action League v. Cavazos, the D.C. Circuit (in an opinion by then-Circuit Court Judge Ginsburg) precluded an implied private cause of action against the Department of Health, Education, and Welfare ("HEW") for its alleged failure to enforce Title VI of the Civil Rights Act of 1964.  906 F.2d 742, 744, 750 (D.C. Cir. 1990).  The court reasoned that the suit was too broad in scope – it sought relief from the federal agency while bypassing the allegedly discriminatory recipients of the federal funding.  Id. at 750.

Taken together, Cannon, Marlow, and the various other cases cited by the parties suggest that the determination about whether to allow an implied private cause of action against a federal funding agency must necessarily be highly fact specific.  While there is no case with circumstances quite like those currently before this Court, it does appear that there are certain, narrow circumstances in which an implied cause of action against a federal funding agency may be allowed in this Circuit.

The question before this Court is whether the facts in the record suggest enough active participation and/or acquiescence on the part of the federal defendants so as to give the Court subject matter jurisdiction over them.  The Court must also consider whether the circumstances justify implying a private right of

action; the Court must balance the various public policy considerations in play and give sufficient weight to the fact that Congress has not explicitly provided for such a possibility.

## ANALYSIS

The federal defendants assert that they played a passive role in the Sandy D-SNAP Program; they provided support, resources, and best practices, but allowed the state and city defendants significant discretion to design and implement the D-SNAP. (See Fed. Defs.' Mem. at 18-21.) Indeed, the federal defendants explain that they believe providing latitude to localities is necessary, particularly in a disaster scenario, because the individuals on the ground are in the best position to determine issues of need, capacity, infrastructure, and the like. (See, e.g., Tr. at 10-13 (stating, for example, that the state and local governments are in the best position to determine the location of application cites because they have a better sense of power outages, floods, facilities, accessibility, etc.).) The federal defendants contend that their intention was to provide New York "with as much information as [they could] so that New York [could] make an informed decision as [it] assessed each county's situation." (Tr. at 17.)

In contrast, plaintiffs argue that the federal defendants were involved in the decision-making from early on in the process, and that they were heavily involved in deciding the hours, locations, and accessibility of the location sites. (Pls.' Mem. at 8, 10 (arguing that the federal defendants "made a 'strong recommendation' that

HRA not use its regular Job Centers as application sites").)  Plaintiffs further contend that the federal defendants imposed what was "perhaps the most onerous of all requirements" – that applicants apply in person or by a representative.  (Id. at 8-10.)  As an additional argument, plaintiffs contend that the federal defendants remained idle after being put on notice that individuals with disabilities were allegedly not receiving the appropriate accommodations.  (Id. at 12 (arguing that the federal defendants did not think there were enough application sites, but approved the program anyway).)[12]

Based on the parties' submissions, the evidence suggests that the federal defendants acted as a funder with which (as one would expect) ideas and experience were shared, along with guidance as to the structure of the regulatory framework. It certainly does not appear that the federal defendants made ultimate decisions concerning the specific design and implementation of the Program.  On the other hand, the operative regime imposed certain requirements (i.e., the in-person requirement) which the federal defendants acknowledge have not, at least in the past, been waived, and that at least in part have given rise to this litigation.[13]

---

[12] While not raised by any party to this litigation, the Court notes that FNS provides localities with a number of suggested topics to cover in a D-SNAP waiver application but disability access is not included on that list.  (See Stephens Decl., Ex. 7 at 49-50.)  Were disability access to be added, it would perhaps provide a useful framework for localities as they consider how best to design reasonable accommodations for individuals with disabilities (and other similar such needs).
[13] The federal defendants note that localities have the option of seeking a waiver from the in-person application requirement (though the federal defendants admit that they have received "less than a handful" of such requests and have never allowed a waiver).  (See Tr. at 15.)  The city and state defendants argue that it was

There are important policy considerations whenever a court extends the reach of private causes of action against government agencies. If evidence suggests that a funding agency knowingly and intentionally imposed requirements that in fact precluded localities from making reasonable accommodations for the disabled as required by the law, a suit against that agency may well be aligned with public policy. Yet, in a situation such as this, where the funding agency acted – during a time of crisis – consistent with its pre-existing regulatory regime, and guided a process consistent with that scheme, justifying a private right of action against that funding agency is difficult. It would be for the Legislature to provide such a right of action in these circumstances.

Here, the federal defendants paired emergency funding with meaningful oversight, shared best practices, offered support, connected localities with thought-partners from other regions of the country, and provided significant discretion to local and state funding recipients. In such a situation, exposing the federal funding agency to private litigation would possibly chill similar such actions in the future – if faced with the possibility of private litigation, the funding agency may be inclined to either provide funds while taking no part in the planning and implementation of the program, or instead, withhold funds entirely. In either scenario, it would be to the detriment of all those intended to benefit from programs such as D-SNAP.

Neither Congress nor the higher courts have directly spoken on this issue. If Congress believes private lawsuits against federal funding agencies should be

---

their impression that the in-person application requirement was a "non-negotiable" for the federal defendants. (See Tr. at 29, 31, 33.)

available, it has within its power the capacity to effectuate that end.  Similarly, if the Second Circuit or the Supreme Court finds that facts such as those currently before this Court are sufficient to justify an implied private right of action, that is their determination to make.  In the meantime, this Court declines to find an implied a private right of action as against the federal defendants:  the facts are too inconclusive, the public policy considerations too serious, and the law too unclear.[14]

## CONCLUSION

For the reasons set forth above, the Court GRANTS the federal defendants' motion to dismiss.  The Clerk of Court shall terminate motion located at ECF No. 67.

SO ORDERED.

Dated:      New York, New York
            November 14, 2013

_____
KATHERINE B. FORREST
United States District Judge

---

[14] To the extent that the possibility of keeping the federal defendants in this action as nominal defendants has been raised (see Tr. at 26-27), the Court declines to take such action.  The federal defendants have represented – and the Court takes their word – that should the city and state defendants be found ultimately liable, the federal defendants would consider paying its proportion of benefits and costs associated with D-SNAP benefits owed.  (See id. at 26; see also Fed. Defs.' Mem. at 24-25.)